Town of Cicero, Appellee, v. Louis Grisko et al., Appellants.

### Gen. No. 14,457.

1. CITIES, VILLAGES AND TOWNS—*presumption as to validity of anticipation warrants.*   The presumption in the first instance is that anticipation warrants issued by a town are legal and valid.

2. CITIES, VILLAGES AND TOWNS—*what constitutes funds coming into possession of town treasurer.*   *Held,* under the evidence in this

case, that anticipation bonds issued by the town of Cicero were not merely bailed to a depositary of the treasurer which subsequently failed but were warrants actually cashed by such depositary and were funds which came into the possession of such treasurer for which he and his surety were accountable to the town.

3. CITIES, VILLAGES AND TOWNS—*when report of treasurer operates as estoppel.* Reports of a town treasurer showing cash in his hands operate to estop both himself and his surety from interposing by way of defense that such cash was on deposit with a bank which bank was insolvent at and before the time of the giving of the bond by such surety and that such loss resulted from the failure of such bank.

4. REVENUE—*what constitutes levy.* It is not the extension of the tax by the county clerk that constitutes a levy upon which the legal issuance of anticipation warrants is predicated; the appropriation bill by the proper authorities of the municipality is the levy.

5. LACHES—*upon what defense of, cannot be predicated.* Failure to take legal action which must necessarily have failed, does not constitute laches.

6. BONDS—*when demand not essential to maintenance of action upon.* In an action upon a bond of a town treasurer to recover money reported by said treasurer to be in his possession, a demand prior to suit need not be shown; the bringing of the suit is itself a sufficient demand.

7. INTEREST—*what constitutes an account stated.* In an action upon the bond of a town treasurer to recover an amount shown as in his hands by reports made by him, interest is properly allowed upon the ground that such reports constituted an account stated.

Action in debt. Appeal from the Municipal Court of Chicago; the Hon. JOHN H. HUME, Judge, presiding. Heard in this court at the March term, 1908. Affirmed. Opinion filed November 12, 1908.

RUNNELLS, BURRY & JOHNSTONE, for appellant.

JOHN J. SHERLOCK and HIRAM T. GILBERT, for appellee.

MR. JUSTICE BROWN delivered the opinion of the court.

The appellee, the Town of Cicero, on a trial before the Municipal Court of Chicago, without a jury, recovered by the consideration of that court on January 22, 1908, a judgment in debt, chancerized at $55,288.80, against the appellants, Louis Grisko and

the Metropolitan Surety Company. From that judgment this appeal is prosecuted.

Louis Grisko was supervisor of the Town of Cicero and therefore, by the charter of said town (Section 5 of the Act of March 25, 1869, revising charters of Cicero) treasurer of the same from some time in April, 1904, until May 20, 1907, when his successor, one Kasperski, who was elected during the month preceding, qualified and assumed office.

The supervisor's term of office was one year, but Grisko, who was originally elected in April, 1904, was re-elected in April, 1905, and again in April, 1906. His duties and obligations as treasurer are defined by Section 5 aforesaid, as follows:

"The Supervisor of said town shall be ex officio the Treasurer of said town, and he shall receive and hold all moneys belonging to the town arising from general or special tax, special assessments, fines, penalties or otherwise, and he shall, upon entering upon the duties of his office, execute a bond to the Town of Cicero, in such sum and in such sureties as shall be determined by the board, conditioned that he will faithfully account for all moneys that may come into his hands, and will pay the same over pursuant to the provisions of law or the orders or resolutions of the board, and that he will faithfully perform the duties of his office. It shall be his duty to keep a correct account of all moneys received and paid out by him, and when required, to furnish from time to time to the board a statement of the moneys in his hands, and he shall receive such compensation as such Treasurer as shall be allowed him by said board, not exceeding two per cent upon all moneys received by him."

During Grisko's first and second terms The American Surety Company was surety upon the official bond presented and filed by Grisko.

On April 16, 1906, Grisko and the appellant, the Metropolitan Surety Company, executed and on April 17, 1906, the Town of Cicero accepted from Grisko a bond in the following terms:

Town of Cicero v. Grisko, 144 App. 564.

"Know all men by these Presents: That Louis Grisko of the Town of Cicero, County of Cook and State of Illinois, as principal, and The Metropolitan Surety Company of New York, a corporation duly authorized to transact business in the State of Illinois, as surety, are held and firmly bound unto the Town of Cicero, county of Cook and State of Illinois, in the penal sum of One Hundred Thousand Dollars ($100,000), for the payment of which well and truly to be made, the above named obligors hereby bind themselves and their respective heirs, executors, administrators, successors and assigns, jointly and severally by these presents.

Signed, sealed and executed this Sixteenth day of April, 1906.

The condition of this obligation is such; that whereas, the above bounden Louis Grisko was on the 4th day of April, A. D. 1906, duly elected to the office of Supervisor of said Town of Cicero, in the County of Cook aforesaid, for the period of one year.

Now Therefore, if the said Louis Grisko shall faithfully account for all moneys that may come into his hands as such Supervisor and pay over the same pursuant to the provision of law or the order or resolution of the Board of Trustees of the Town of Cicero, and shall faithfully perform the duties of his office to the best of his skill and ability, then this obligation to be void, otherwise to remain in full force and effect.

> LOUIS GRISKO,
> The Metropolitan Surety Company,
[SEAL.]  CHARLES G. FREEMAN,
> Resident Vice President.
> WALTER FARADAY,
> Resident Assistant Sec."

On June 3, 1907, Grisko, through one Mr. Buckley, the Town Clerk, whom he, being an illiterate man, employed and paid as his clerk and bookkeeper, presented to the Board of Trustees of Cicero a document purporting to be and entitled,

"REPORT OF LOUIS GRISKO, TREASURER OF THE TOWN OF CICERO. JAN. 1ST TO MAY 20, 1907."

This report Mr. Grisko testified in this case was to

the best of his knowledge correct; and that it was made and presented by his authority and direction, although he did not sign it, nor was asked to do so.

It begins with a recapitulation of the subsequently detailed figures of receipts and expenditures, and this recapitulation has for its first item a debit to the Treasurer of $92,646.09 as the amount on hand December 31, 1906, at which date a prior report had been made by him to the Board showing that amount on hand. It appears in this form:

"Balance Dec. 31st, 1906,  $92,646.09."

This is followed by items representing receipts by the Treasurer from "the sale of Tax Warrants," receipts from the Town Collector on the account of taxes and otherwise, and some interest on deposits. The whole amount of debits is $175,433.39. On the other side of the account in the recapitulation is a variety of items describing payments by the Treasurer on various accounts to the amount of $117,614.34, and the final entry, "To Balance,  $57,819.05," making, with the credited payments the sum of the debits, $175,433.39.

Beneath this balancing of the account is the memorandum:

"Balance in Lincoln Bank now defunct, from sale of appropriation tax warrants years 1905 and 1906,  $53,490.91.

Balance cash on hand,  4,328.14.

Total,  $57,819.05."

As implied by this memorandum it appears that although (as is stipulated in the record) "upon said 20th day of May, A. D. 1907, it became and was the duty of Grisko to pay over to Kasperski as his successor in office, all moneys which had come into the hands of said Grisko as Supervisor, or which had not been paid out by him pursuant to the provisions of law or the order or resolution of the Board of Trustees of the Town of Cicero, or which had not otherwise been law-

fully accounted for by him," the money was not available to him to thus turn over the stated balance of $57,819.05. He turned over instead only $4,328.14, and reported as to the balance, amounting to $53,490.91, that it was a deposit in Lincoln Bank, a private bank in the Town of Cicero (at Morton Park), which had been before August, 1905, owned and operated by William W. Weare, doing business as William W. Weare & Co., as a banking house under that name, but in that month had been transferred to one William J. Atkinson, who changed its name to the "Lincoln Bank." Atkinson took possession of the Bank on October 1, 1905. He seems to have paid Weare for it with practically all the good assets in the Bank, substituting for them some worthless bonds of a water company in which he was interested. The public were presumably not aware of this, and the deposits shown on the books of the Bank increased from thirty or forty thousand dollars to over a hundred thousand. Atkinson re-deposited the money received in a Chicago Bank and carried there assets or securities received, and then made loans at that Bank, which, when the end of this species of financiering came, with the closing of the doors of the Lincoln Bank and the appointment of a receiver in bankruptcy for Atkinson on December 17, 1906, were apparently sufficient to absorb the funds and collateral on deposit and leave only enough assets in the estate to pay the bankruptcy expenses.

Because of the failure of Grisko to pay over to his successor the entire amount shown by the report above described to be chargeable to him, this present suit was begun against him and the surety upon his last official bond, the Metropolitan Surety Company. The action was in debt, and the declaration set forth the bond and its breach in that "while the said Louis Grisko was the Supervisor of the plaintiff large sums of money  *   *   *  belonging to the plaintiff came into the hands of Grisko as such Supervisor, for which

said 'Grisko did not faithfully account and did not pay over the same * * * to his successor, * * * but * * * neglects and refuses'' so to do, etc.

To this declaration Grisko and the Company filed four pleas: First, *nil debet;* second, *non est factum;* third, that Grisko ''has at all times faithfully accounted for all moneys that came into his hands as Supervisor. * * * and paid over the same pursuant to the provisions of law or the order or the resolution of the Board of Trustees of the Town of Cicero, and faithfully performed the duties of his office to the best of his skill and ability, according to the true intent and meaning of said writing obligatory,'' and fourth, that if ''the plaintiff has been damnified for or by reason or means or on account of any failure of said defendant, Louis Grisko, to pay over any or all moneys belonging to the plaintiff which came into the hands of the said Louis Grisko as Supervisor, etc., the said plaintiff has been so damnified of its own wrong and through its own means and default, to-wit, that the said Louis Grisko paid over all the moneys that came into his hands as said Supervisor, pursuant to the provisions of law, by the order or resolution of the Board of Trustees of the Town of Cicero, to the Lincoln Bank of Morton Park, Illinois, or to other person or persons designated by said Board, and, so did faithfully account for all moneys coming into his hands as such Supervisor.''

A demurrer was sustained to the first plea. On the second issue was joined, and to third and fourth replications were filed traversing their allegations that Grisko had (a) faithfully accounted; (b) paid over all the moneys that came into his hands, pursuant to the provisions of the law or the order or resolution of the Board of Trustees of the Town of Cicero, etc.; (c) faithfully performed the duties of said office of Supervisor to the best of his skill and ability according to the true intent of said bond;—and tendering issue on each of the propositions stated.

On the trial, as before stated, the court found for the plaintiff and assessed its damages against both the defendants at $55,288.80, and after overruling a motion for a new trial and a motion in arrest of judgment gave the judgment herein appealed from.

The defense which was made below and is repeated here on the assignments of error is divided into these propositions:

A. That over $48,000 of the $53,490.91 described in the Report of Grisko to the Town Board of June 3, 1907 (which with interest at 5 per cent. from May 20, 1907, to January 22, 1908, is the amount of the judgment herein), should not be charged against Grisko ·as "moneys that had come into his hands as Treasurer," and that therefore its loss is not covered by his official bond.

Under this general proposition it is urged (1) that the report in question does not estop Grisko, and still less the surety on his bond, from showing the true nature of the debit this charged to him,. (2) That such showing is that the sum of $48,340.96 out of the $53,490.91 reported as in the Lincoln Bank was simply the aggregate face amount of certain so called "anticipation warrants" issued by order of the Board of Trustees of the Town of Cicero, and placed by order of the same Board (not even through the official action of the Treasurer) in the hands of the Lincoln Bank—not as money, but simply as paper of the Town. (3) These "anticipation warrants" were illegally issued by the Town and as they were illegal and given to the Lincoln Bank by the Town, any money which the Lincoln Bank allowed or credited on them to the Treasurer or otherwise, if it did so credit it, was not money coming into his hands as Treasurer in purview of his official bond. The illegality of the warrants depends on the fact (a) that they were unnecessary to defray the ordinary expenses of the Town and consequently unauthorized by the statute; and (b) that they were not issued against "taxes already levied," which was a requisite to their validity under the statute.

It is further insisted that the Town was guilty of laches barring recovery because after the failure of the bank it took no steps to stop payment of the warrants.

B. That a large part of the loss occurred before the Metropolitan Surety Company became surety. For such loss the Company is not liable. No estoppel arises from Grisko's reports made to the Board of Trustees and filed with the Town Clerk, of the balances on hand April 17, 1906, June 30, 1906, October 1, 1906, December 31, 1906, and May 20, 1907, because Grisko was not a defaulter, did not consciously render a false report and did not deceive the Town.

C. That a demand was necessary before bringing suit, and none was made.

D. That the judgment asked for and rendered is too large, because (1) the Surety Company should have been allowed a credit of $6,858.84 on account of the general town warrants cashed or paid by the Bank just prior to its failure, and for which the Bank has not been re-imbursed. This amount it is claimed should be credited against the liability on the bond— wiping it out altogether if the "anticipation warrants" are not included in it—and reducing it by $6,858.84 if they are. (2) Interest on the balance reported as of May 20, 1907, should not have been allowed.

The facts on which these defenses are predicated are these:

By the charter of the Town of Cicero (Private Laws of 1869, vol. 3, p. 666) the government and corporate powers of the town are vested in and exercised by a board of seven trustees. Of these the Supervisor is one *ex officio,* he and the Assessor and Collector with four other persons elected as Trustees making up the seven. This Board has by the charter "the general management and control of the finances and all the property, real, personal and mixed, belonging to the town."

By an act of the legislature approved May 31, 1879,

and amended May 11, 1901, it is provided "That whenever there is not sufficient money in the treasury of any county, city, town, village, school district, or other municipal corporation, to meet and defray the ordinary and necessary expenses thereof, it shall be lawful for the proper authorities thereof to provide a fund to meet said expenses by issuing and disposing of warrants drawn against and in anticipation of any taxes already levied by said authorities for the payment of the ordinary and necessary expenses of such county, city, town, village, school district, or other municipal corporation to the extent of seventy-five per centum of the total amount of any such tax levied; provided, that warrants drawn and issued under the provisions of this section shall show upon their face that they are payable solely from the taxes when collected and not otherwise; and shall be received by any collector of taxes in payment of the taxes against which they are issued, and which taxes against which said warrants are drawn shall be set apart and held for their payment".

April 20, 1905, the board of trustees unanimously (Grisko being present) passed the following resolution:

"Resolved, that the finance committee be and they are hereby instructed to confer with banking firms and ascertain what rates of interest will be charged and what arrangement can be made for cashing tax warrants issued on the 1905 appropriation".

On April 26, 1905,—Grisko also being present and voting—the board of trustees unanimously concurred in the following report of the finance committee:

"The Committee on finance, to whom was referred the resolution of Trustee Bills directing the finance committee to confer with banking firms to ascertain what rate of interest and what arrangements can be made for cashing warrants issued on 1905 appropriation, would respectfully report that we have conferred with various banks and find that William W. Weare & Co. agree to cash town warrants drawn against the 1905 appropriation, and charge therefor at the rate

of 4½ per cent interest per annum for the money advanced. The finance committee recommend that the proposal of William W. Weare & Co. be accepted''.

They also unanimously passed the following resolution on the same day:

''Resolved, that the President and Town Clerk be and they are hereby directed to issue a tax warrant on general funds in favor of William W. Weare & Co. for $4,644.71, for the purpose of creating a fund from which to pay warrants drawn in accordance with reports and recommendations submitted by the finance committee to the board and accepted; said warrants to be redeemed by the treasurer upon receipt of the 1905 taxes from the collector''.

Subsequently, during the year 1905, at intervals of a few weeks, eight other resolutions directing the issuance of anticipation warrants substantially in the same terms employed in the resolution of April 26th, were passed. At every meeting except one Grisko was present and at each meeting voted for the resolution, which was in each case passed unanimously. The aggregate amount thus ordered in 1905 (excepting one apparently ordered Sept. 28th, which was evidently not issued, but included in order of the next day, Sept. 29th) was $24,498.63.

On January 18, 1906, the following resolution was unanimously adopted, Grisko voting for it:

''Resolved, that the finance committee be and they are hereby directed to confer with the different banking associations for the purpose of ascertaining the lowest rates of interest that would be charged in cashing Town of Cicero tax warrants issued upon the 1906 appropriation in anticipation of the collection of the general taxes for said year, said committee to make report at the next session''.

February 1, 1906, the board, with one dissenting vote—Grisko voting in the affirmative—''accepted the proposals of the Lincoln Bank'' and ''concurred in'' a report of the finance committee as follows:

''Your Committee on finance, to whom was referred

the resolution directing that the finance committee confer with banking firms and arrange for cashing tax warrants issued upon 1906 appropriation, would respectfully report that we have conferred with several banks and recommend the proposition of the Lincoln Bank, who will agree to cash the same at 4½ per cent interest, be accepted".

On the same day, February 1, 1906, the following resolution was unanimously adopted by the board of trustees:

"Resolved that a tax warrant be and the same is hereby ordered issued in favor of Lincoln Bank upon the Water Works Bond Sinking Fund in the sum of $1,150, for the purpose of paying interest on Water Works Bonds due Feb. 4, 1906; said Tax Warrant to be issued upon 1905 appropriation".

(NOTE: By a singular blunder in the abstract (not noted by either party in argument) this resolution has been wrongly recited therein, and the warrant ordered represented to be an "anticipation" warrant on the taxes of 1906. It was not an "anticipation" warrant on the taxes of 1906, as will be seen—a fact not without some significance, in our opinion (when its disposal is considered), on the contentions in this case.)

On the same day also, February 1, 1906, it was unanimously ordered by the trustees, in substantially the language of the various resolutions of the preceding year, that tax warrants be issued upon the 1906 appropriations against general funds in the sum of $2,264.47 in favor of Lincoln Bank for the purpose of creating a fund from which to pay warrants ordered drawn.

Between February 1, 1906, and October 1, 1906, eight other warrants were ordered issued by eight separate resolutions, each unanimously passed.

These anticipation warrants were drawn addressed to the treasurer of the Town of Cicero, ordering him to pay from the tax levies of the years 1905 and 1906, respectively (according to the date of the warrant),

"appropriated and levied for the Corporate Expense Department" so many dollars to "W. W. Weare or bearer" or "The Lincoln Bank or bearer" (according also to the date of the warrant), with interest at 4½ per cent. per annum from date. The warrants recited also that they were payable solely from the taxes of 1905 or 1906, as the case might be, when collected, and not otherwise; and that such taxes were pledged to their payment, etc. They were signed by Timothy J. Buckley as town clerk, and George Comerford as president.

On April 25, 1905, Grisko *as treasurer* had deposited with "William W. Weare & Co., Bankers", $399.95, and on May 1, 1905, $5,000, and these sums had been credited to "Louis Grisko, Treasurer", on the ledger of the Lincoln Bank. The second item at least was a check from the town collector. Grisko was given a bank pass-book in the usual form of the bank, which was entitled "William W. Weare & Co., Bankers, Morton Park, Ill., in account with Louis Grisko, Treas".

The first two items were:

  Cr.
  1905.

| | |
|---|---|
| April 25, F. | $ 399.95. |
| May 1, W. | 5000.00. |

In the ledger of the bank the corresponding entries also appear:

| 1905 | fol. | Debit. | Credit. | Balance. |
|---|---|---|---|---|
| April 25, | 207 dep. | | 399.95 | 399.95. |
| May 1, | 211 dep. | | 5000.00 | 5399.95. |

The next succeeding items on the Bank ledger, however, are debit entries.

The Bank by arrangement paid on presentation any general warrants issued by the Town of Cicero and brought to them for cashing. These general warrants were for the ordinary, usual expenses of the town, and were signed by the president and clerk of the

town, and stamped across the face payable at the Lincoln Bank.

During May, 1905, a check of the treasurer's for $250 and twelve general warrants aggregating $2,411.61 were presented (on different days) to the bank and paid by the cashier, who, as each item was paid, entered it as a debit entry on the "Grisko, Treas." ledger account, and made the "balance" carried out on the right of the page correspondingly less.

On May 13th this balance is shown as $2,738.34. On May 15th Grisko deposited with Weare & Co. a check on the Chicago Bank in which he kept town funds for the full amount of these warrants—$2,411.61 —making up the balance again to the $5,399.95 deposited, less the $250 check, or $5,149.95.

The cashier testifies that after that time, although the bank was continually paying general warrants presented to it, there were no charges of them made against the Grisko, Treas. account, but that they were held as cash slips in the cash drawer until a considerable sum had accumulated, and then some messenger from the bank would go down to the town hall and get a check from Buckley to be signed by Grisko and countersigned by Buckley for their amount. This course, the cashier said, was taken by Mr. Weare's instructions. When Atkinson took possession of the bank he directed that the same course should be continued.

It is of course evident from this that some arrangement not to deplete the treasurer's balance in the Weare and Lincoln Bank had been made for the benefit of somebody.

Mr. Grisko says that being no bookkeeper, he employed Mr. Buckley for $250 in 1905 and $500 annually in 1906 and 1907, to keep his books and transact all his business, and that he had no explanation of paying back the $2,411.61 to the Cicero Bank by a check on the Chicago Bank to make, except that he depended entirely on Buckley and signed any check or did anything Buckley suggested without hestitation. As to

the subsequent withholding of any charge of the warrants cashed from the ledger account and their reimbursement by a check on a Chicago bank, although, as will be seen, large sums were piling up to the treasurer's credit at the Cicero Bank, Mr. Grisko has no further explanation than that he trusted Buckley to do his business, that he did not know what the "anticipation warrants" were or what they meant, or that he could draw any money on them. He testified, however, that he had looked over the report to May 20, 1907, and believed it to be all right, and that the preceding quarterly reports were made by Mr. Buckley under his direction and authority.

Buckley swears that Grisko employed him first in April, 1905 (which it is to be noted was a year after Grisko's first election), as his bookkeeper for a year "to keep his accounts as treasurer", and paid him $200 for it, and that in 1906 Grisko subsequently employed him as his clerk for a year and paid him $500 for his services, which terminated at the expiration of Grisko's tenure of office, May, 20, 1907, and that he, Buckley, kept a complete set of books showing all receipts, collections and disbursements of Grisko as treasurer, and that he made out from those books quarterly reports, which he presented to the board of trustees at Grisko's direction, but that when he drew checks on the Prairie State Bank or the Colonial Bank of Chicago to re-imburse the Weare or Lincoln Bank for warrants paid by them, he did so because he was directed to do so by Grisko, who had also told him that he had arranged with the Lincoln Bank to cash the ordinary town warrants at that bank; that he, Buckley, did not and does not know why Grisko kept the account increasing at the Lincoln Bank while paying warrants from the Chicago funds. He says, "I knew nothing of the treasurer's cash at all". Again he testifies, that he does not recall that he ever had one of the collector's checks given to the treasurer in his hands, or that he ever made out a deposit slip for them

or had anything to do with their deposit in the Chicago banks. He says: "I did not know there was a fund in the Lincoln Bank out of which the warrants could be paid"; that so far as he knew, except as Grisko told him of deposits in the bank, Grisko might have kept the money in his pocket; that Grisko gave him a check book on the Colonial Bank and told him to draw all checks from that check book for the warrants, and that he, Buckley, had personally or by advice or direction nothing to do with where Grisko deposited his money or on what bank he drew his checks, except to obey Grisko's directions.

Wherever the truth may lie in these conflicting statements of Grisko and Buckley in this testimony, and whatever the influence or agency of Buckley in the matter of the anticipation warrants, hereafter discussed, the controlling fact is that it was not Buckley but Grisko who was treasurer, who was responsible to the town and the people for the money and the places in which he deposited it and for whom the Metropolitan Surety Company became bondsman.

On June 10, 1906, there was the first deposit in the Lincoln Bank (or Wm. W. Weare & Co. bank, as it was then) of the "anticipation" warrants. On that date the anticipation warrant voted on April 26, 1905, for $4,644.71, and a similar "anticipation" warrant voted on June 1, 1905, for $3,900.60, were taken to the Bank by Grisko, to whom the warrants had been handed. He says that Buckley went with him, and that before going when Buckley handed him the warrants, he said, "We will go to the bank and make the deposit of these warrants". The abstract makes Grisko say that "after the first time Buckley did not tell me what to do with them because I knew", which is doubtless an inadvertent, but serious departure from the record.

The testimony of Grisko was that before these particular warrants were handed to him by Buckley, the remark above quoted, about going to the bank and

depositing them, was made. Then Grisko was asked:
"And *after* he handed them to you what did he say?"
Counsel objected. The court allowed him to answer.
He began to answer thus, "Well, he didn't—" Coun-
sel interrupting: "Q. Did he tell you what to do with
them? A. He didn't say anything afterwards, be-
cause I knew where to deposit them". This is a very
different statement from that which appears in the
abstract.

The two warrants were handed by Grisko to the
cashier, who thereupon placed in the pass bank book of
"Grisko, Treas.", the third entry as follows:

    June 10th,  Warrants              $8545.31,

and made that day in the bank ledger in the account
of Louis Grisko, treasurer, a credit entry, which with
the preceding, before described, we show here:

|  |  |  | Credit. | Balance. |
|---|---|---|---|---|
| May 15, | 224 Dep. |  | 2411.61. | 5149.95. |
| June 10, | 245 Tax Warrants | 8545.31. | 13695.26. |

It will be seen the amount of the tax warrants was
added to the previous balance (conceded to be of cash)
to make the credit balance at the close of banking
hours on June 10th.

On July 10, 1905, the warrant voted on June 28,
1905, for $2,198.51 was carried to the bank and handed
to the cashier. A precisely similar entry was made
of its amount in the pass book and the bank ledger,
bringing up the balance in the latter to $15,893.77.
So on August 7th a warrant voted on July 26th. On
October 16th two warrants, one voted on August 31st
and one on September 29th, and on December 14th
two warrants voted respectively on November 2nd and
November 28th, were taken to the bank (which before
these later dates had come into possession of Atkin-
son) and similar entries were made of their amounts
in Grisko's bank book and in the ledger—the latter
entries bringing up the balance of "Louis Grisko,
Treas.", credited in that account to $29,648.58.

February 24, 1906, there were taken to the Lincoln

Bank and credited to "Louis Grisko, Treasurer", in a lump sum of $3,414.47, the "tax warrant issued in favor of Lincoln Bank upon the Water Works Bond Sinking Fund in the sum of $11,500, for the purpose of paying interest on Water Works Bonds due February 4, 1906, said tax warrant to be issued on 1905 appropriation", ordered, as before noted, on February 1, 1906, and the anticipation tax warrant ordered on the same day, issued on the 1906 appropriation for $2,264.47, "in favor of Lincoln Bank for the purpose of creating a fund from which to pay warrants ordered drawn", etc.

There was no distinction made in the treatment of these warrants, and it is to be noted that although thus depositing the water bond interest warrant in his account at the Lincoln Bank and receiving credit for its amount in his balance, which at the close of February 24, 1906, was $33,063.05, Grisko paid in that quarter, as his report to the trustees from Jan. 1, 1906, to April 17, 1906, shows, $1,125 of Water Bond coupons by check on the funds in a Chicago bank.

On April 12, 1906, anticipation warrants on the 1906 taxes voted March 1st and March 27th, on June 16th warrants voted May 1st and May 28th, on July 20th a warrant voted on July 2nd, on September 12th, warrants voted on July 30th and Sept. 5th, and on October 22nd a warrant voted on October 1st, were taken to the bank, handed to the cashier and their amounts entered like the previous ones in the bank book and the ledger. In the place of the word "warrants", however, there appears after the dates of the last three entries the letter "F", probably signifying the initial of the name of the cashier who took the deposit and made the entry. The total of credits shown in the pass book after the entry of Oct. 22nd was made was $53,740.91, and the balance in the bank ledger was the same amount, less the one check of $250, which had been drawn and paid on this account, or $53,490.91, which was reported to the Town

Board, as we have seen, on June 3, 1907, as the "Balance in Lincoln Bank now defunct".

Some point is made in the arguments as to who took the various warrants to the bank. We do not consider it material, for they were taken in the name of and credited to Louis Grisko, Treasurer, but it may be noted that the cashier remembers Grisko and Buckley and a messenger from the town hall each bringing one or more, but says she never saw Grisko and Buckley at the bank together, while Grisko says Buckley went with him three times to make deposits, and that he went alone sometimes, and Buckley seems in his testimony to state or imply that he never was present when a deposit was made.

It is interesting to note what became of these warrants after they were left at the bank. "I put them in the safe and notified Mr. Atkinson that they were there, and the next morning he took them away and I never saw them again. I learned afterwards that he took them down town and borrowed money on them", is the cashier's testimony about this.

These warrants have been all paid by the town—some by Grisko while treasurer and some by his successor.

Evidence was introduced in this case also tending to show that the Lincoln Bank was so treated by Atkinson that it must have been insolvent shortly after he obtained control of it, but this transpired to the public only after the bankruptcy proceedings against him revealed it.

During the time when these tax appropriation warrants were issued and Grisko was thus carrying them to the Lincoln Bank and receiving credit in his account there as treasurer for their amount, there was either in the Prairie State National Bank or the Colonial Trust & Savings Bank of Chicago, to the credit of Grisko as treasurer funds belonging to the town of sums varying from $119,582.08 on August 31, 1905, down to $12,012.22 on October 1, 1906.

As to the money there was evidence tending to show, however, that the Treasurer had in his keeping "about twelve general funds and 350 different special assessment funds", all, however, kept together so far as his bank balances went, and that there was, therefore, no way of telling from a bank account of the treasurer whether the money in that account was or was not legally available for the payment of particular warrants.

From these facts, as we have said, the appellants deduce the proposition that the Treasurer and his official bondsman are not liable to the town for the amount of these tax appropriation warrants. We do not think their reasoning sound.

The warrants in question are not shown, in our opinion, to have been illegally issued, even if we should adopt the theory, which we regard as open to very serious question, that because of irregularity or even illegality in their issuance, their proceeds coming into the hands of the Treasurer as the money of the town, was not covered by the terms of the bond in question here. That question is academic, however, in this case.

The presumptions are in favor of the legality and validity of the warrants and the action of the trustees. The objection that they were not necessary to defray the ordinary expenses of the town is not proven by the showing of other funds in the treasurer's hands. The trustees must be held to be the proper judges of the necessity. To decide on this is a duty especially confided to them. What the necessary expenses or what the possible emergencies of the town were not shown in this record, nor even to what funds or for what purposes the money in the hands of the treasurer was legally and regularly available. The objection that the warrants were illegally issued because issued against a tax levy not then made, is not well taken, because this also is unproven. The objection proceeds on the theory that the extension of the

tax by the county clerk is the "levy". That is not the law. Gage v. Bailey, 102 Ill. 11. The appropriation bill of the proper authorities of the municipality is the "levy". In section 8 of the Act of March 25, 1869, to revise the charter of the Town of Cicero, it is expressly provided that "all amounts of moneys appropriated" by the Board of Trustees "shall be deemed a tax on the taxable property of said town". There is nothing in this record to show that apropriation of the amount of the "anticipation warrants" had not been made when they were ordered. Indeed there are indications, somewhat obscure in the absence of a complete record of the doings of the trustees and treasurer respecting them, that the appropriations did exist and that the very bills that the amount of the "anticipation warrants" was meant to pay were specified when the warrants were issued, and were thereafter paid on general warrants by the treasurer out of his Chicago funds, instead of out of the fund especially created to meet them.

However this may be, the presumption is in favor of the regularity and validity of these anticipation warrants when they were issued.

What then became of them? The position of the appellants that they were simply left with the Lincoln Bank as a bailee, and that it misappropriated them, is not consistent with the course adopted by the treasurer. They were expressly issued by the Board of Trustees, of which he was a member, for the purpose of *creating a fund* to pay certain general warrants recommended by the finance committee. They were issued payable to Weare or bearer or to the Lincoln Bank or bearer, after votes of the said Board of Trustees recommending that the proposals of Weare and of Lincoln Bank to "*cash*" said warrants at a certain rate of interest be accepted; they were handed to Grisko as treasurer; they were taken by him or by his authority and direction evidently to the bank; the amount of them was passed to his credit

on the ledger and entered on the bank pass-book which he held as treasurer; they were treated as the property of the bank by the proprietor; at first and evidently until some other arrangement was made, general warrants were paid from the fund thus created and charged against it, and finally the amount of their proceeds was reported every three months to the Board of Trustees by Grisko as treasurer through his authorized agent as *"cash"* in his hands. The appellants vigorously contend that these reports work no estoppel on them from denying that there was such cash on hand. It is not necessary to invoke any doctrine of estoppel to justify considering the proof sufficient that these warrants were not "bailed to" but "cashed by" the Lincoln Bank. These reports were at least admissions of the treasurer to that effect, made, as we believe, under all the circumstances that appear in this record, despite his own testimony, quite intelligently and consciously; but even these admissions were not necessary to the case against him, because it was proven by the facts without them. That the amounts entered were "paper credits", as the appellants say, is doubtless true; so are most of the transactions by which obligations are "cashed" precisely similar paper credits. A man takes to a bank bonds to be sold or notes to be discounted or drafts or bills of exchange to be negotiated or checks to be collected, and in the great majority of cases receives for them a bookkeeping credit in the books of the bank, evidenced besides by an entry on his pass-book. Frequently if not unusually too, these various transactions are respectively identified in the pass-book by the notation of the kind of obligation that is the subject of the deposit. Thus, "chks." may appear against one item, "bds." against another and "disc." against a third, meaning that the deposit was made in the first instance in checks, in the second in bonds, and in the third in notes. This is all a matter of common experience and knowledge, and is what happened in

the present case. The term "Warrants" after the entries in pass-book and ledger by no means shows that the items were not intended to be entered as cash, but were mere receipts for the instruments, as appellants contend. It only shows the source of the cash entry. So little importance indeed was attached to it that in the last three entries in the pass-book it was changed for the initial of the cashier, another customary note or quasi-identification of the transaction. The deposits in question produced a cash balance "in the hands" and control of the treasurer as really and efficiently as though the bank had paid Grisko in gold coin for the warrants and he had re-deposited the coin to his credit.

It is said that the town was guilty of *laches* which should prevent its recovery, because it took no steps to stop payment of the warrants after the failure of the bank. Such attempt would have been futile. The obligations were valid, as we have said, and in the hands of holders for consideration. There is nothing in this point.

But it is said that the bank was insolvent after a large part of this balance credited to Grisko had accrued and before the Metropolitan Surety Company became the surety on his bond April 16, 1906, and that therefore the default, if there was one, on the part of Grisko as treasurer, was, so far as that amount was concerned, before the bond sued on was executed, and that the appellant Surety Company is not liable therefor. This defense cannot be sustained. It is true that as a banking house—a separate business—which alone the cashier, Miss Flagler, could and did testify about, and which alone Mr. Jennison, the expert accountant called, seemed to testify about, the Lincoln Bank seems shown by the testimony to have been in a bad way before April, 1906; and it also appears by the testimony of Mr. Sessinghaus that the estate in bankruptcy of William J. Atkinson, of whose assets the "Lincoln Bank was a part", as the accountant,

Mr. Jennison, says, will pay but very little, if anything, to creditors; but all this falls short of actual proof that William J. Atkinson, *all* of whose assets were liable for every cent of the liabilities of this privately owned ''banking house'', was insolvent before April 16, 1906, or could not have been made to respond at that date for the deposits of the Lincoln Bank. It is quite conceivable that ''plunging'' and ''speculation'' in other schemes, into which he put the funds of his ''banking business'', brought him to irredeemable bankruptcy between April 16, 1906, and December 17, 1906.

But aside from this and on the assumption that both the ''banking house'' and its owner were proved hopelessly insolvent before April 16, 1906, the Metropolitan Surety Company could take no benefit therefrom. Even if, as claimed by appellants, the reports of the treasurer to the Board of Trustees worked no estoppel against his showing that what he charged himself with as ''cash'' was in fact merely receipts for negotiable paper of the town, yet when that proposition is rejected on other grounds, and it is held that the face amounts of the warrants after they were left with the bank were ''cash'' in his hands, the reports estop him and his surety from denying that the cash was in his hands and control (however insolvent his bankers or other debtors might be) when he so reported it. This proposition is supported by explicit decisions of the Supreme Court of Illinois, such as Morley v. Town of Metamora, 78 Ill. 394; Chicago v. Gage, 95 Ill. 593; Cawley v. People, 95 Ill. 249; Longan v. Taylor, 130 Ill. 412; and Cowden v. Trustees of Schools, 235 Ill. 604.

The principle of these cases governs in this case on this point. It is consistent with justice and right reason. The distinction which counsel makes between these cases and the one at bar, in that in them there were conscious defalcations and concealment by false reports, while in the present case there was neither,

operates, as we think, rather against than for their contention.

In the present case there could have been no concealment from the Surety Company when it signed the bond in question. It could have seen the reports and investigated their truth. It could have required information as to where every dollar reported was to be accounted for, and on the assumption of Grisko's honesty as insisted on, could have obtained it. Then, it could have investigated (better probably, because with more facilities—certainly as well—than any citizen or officer of Cicero) the condition of the Lincoln Bank. It was heedless and negligent in not doing so. The more ignorant or illiterate Grisko was, the greater was its heedlessness and negligence. They do not work to the damage and disadvantage of the town, which relied on its bond, but to its own.

Appellants say that judgment should not have gone against the defendants, because no demand was made upon Grisko before bringing the suit, and Dreyer v. The People, 176 Ill. 590, is cited to show the necessity of such demand. That on a criminal indictment for the statutory offense of not paying over money to a successor in office, a man cannot be sent to the penitentiary without proof that the said successor demanded such payment, is a very different proposition from the one urged here—that in a civil case a man who has not turned over such money and has practically admitted that he had no money to turn over, cannot with his surety be sued on a bond which binds him to account for and pay over the same pursuant to law, and faithfully perform the duties of his office. No demand was necessary. The suit is a sufficient demand.

Nor is the position tenable that the town warrants for $6,858.84 paid by the Lincoln Bank before its failure should be set off against the liability of the appellants on the bond sued on here. William J. Atkinson, under the name of The Lincoln Bank, or other-

wise, is not a party here. There is no proof in this record that the choice of a bank was dictated to or forced on Grisko. The warrants were to be cashed by the Lincoln Bank, but their proceeds might have been deposited by the treasurer wherever he wished. He and his bondsmen are responsible for all the money which his accounts show in his hands and which he has not turned over.

We think that interest was properly allowed on the amount found due. The doubt, if there be one on this point, arises from the fact that no demand was made on Grisko before bringing this suit, but, as we have said, he practically declared by his last report and subsequent action that he could not pay anything beyond the $4,328.14 which he did turn over. The last report, accepted without dispute by the Board of Trustees, liquidated and settled the amount due. We think that the principle of Cassady v. Trustees, 105 Ill. 560, and Stern v. The People, 102 Ill. 540, requires the allowance of interest.

The judgment of the Municipal Court is therefore affirmed.

*Affirmed.*